UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LESLIE BOND, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| CONRAD SIMPSON, individually and in his representative capacity as an officer of the INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT, a division of THE CITY OF INDIANAPOLIS, *et al.*, | ) Cause No. 1:10-cv-865-WTL-TAB<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendant. | )<br>) |

### ENTRY ON DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

This cause is before the Court on the Defendants' Motion for Summary Judgment (dkt. 42). The motion is fully briefed, and the Court, being duly advised, **GRANTS** the Defendants' motion for the reasons and to the extent set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations,

that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. BACKGROUND[1]

On July 28, 2008, at approximately 11:30 p.m., dispatchers for the Marion County Sheriff's Department received an incomplete 911 call. The 911 call came from 5146 W. Naomi Street and included a phone number registered to a Deana Bond. Based upon the disconnected 911 call, at 11:31 p.m. an operator dispatched Officer Conrad Simpson, an officer with the Indianapolis Metropolitan Police Department ("IMPD"), to investigate.

In fact, the 911 call was initiated following an argument between the Plaintiff Leslie Bond ("Bond") and his wife Deana. The argument centered around a $2,500 charge that Bond

---

[1] In his response to the instant motion, Bond states that he does not respond to the Defendants' motion for summary judgment as to certain of his claims, namely, his claims for failure to intervene, violation of equal protection, violation of substantive due process, and all remaining claims against Officer Layton. Local Rule 56-1(f) provides that the Court will assume that the facts claimed and supported by admissible evidence by the movant are admitted without controversy except to the extent that the non-movant specifically controverts the facts in that party's "Statement of Material Facts in Dispute" with admissible evidence. In a footnote to his fact statement, Bond explains that he has limited his "Statement of Material Facts in Dispute" to those relating to the one claim to which he has responded, his unlawful entry claim, while noting that other facts not germane to that claim are in fact disputed. Bond then cites a laundry list of deposition testimony. To the extent that Bond has not specifically controverted the facts in the Defendants' statement relating to issues other than his unlawful entry claim, and furthermore to the extent that Bond admittedly does not respond to these claims, the Court considers all properly supported facts relating to these other claims to be admitted for the purposes of this motion. *See LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389 (7th Cir. 1995) ("We have on numerous occasions upheld a district court's strict adherence to that rule. . . . Thus if the party opposing summary judgment fails to respond to the facts set out by the movant, the court may assume those facts to be admitted and use them in determining whether the movant is entitled to judgment as a matter of law.").

2

had discovered on their credit card. After the Bonds' daughter went to bed, Bond confronted his wife. However, she attempted to get in the shower in what Bond believes was an effort to avoid the conversation. The conversation escalated as both Bond and Deana raised their voices. At some point, Bond yelled "Damnit, I want an answer," and slammed the bathroom door, breaking the top hinge. He then tore the shower curtain off the wall because he believed Deana "was trying to go in [the shower] so she didn't have to explain $2,500 on the credit card." According to Bond, after he broke the door, Deana said, "Don't be doing that, I will call the cops." This further angered Bond, and he then dialed 911, handing the phone to his wife. Deana did not know who Bond had called. Taking the phone, Deana said, "I don't want it." She then threw the phone into the sink, breaking it.

Deana then remembers continuing to argue with the Plaintiff for "several minutes" after she threw the phone in the sink and broke it, explaining that he did not leave the bathroom until approximately fifteen minutes after Deana broke the phone. She explained that it was then roughly five minutes before she walked into the living room and saw the police.

Bond remembers the following events differently. According to Bond, after Deana threw the phone in the sink, Bond left the bathroom and went into his bedroom, and this ended the argument. He did not speak to Deana again until after he was arrested. Bond does not remember the amount of time that passed between the end of the argument and the arrival of police, explaining at first, in his "guesstimation," the argument had been over for about twenty minutes before the police arrived, but later stating that "It's rough when adrenaline is going, 10, 20 minutes. It could have been 10 minutes [when we were not arguing], I don't know. I just know I handed her the phone, walked in the room, got clothes together, I slid on my jean shorts, [and]

3

that is all I got done when I heard the police knock on the door. I'm not exactly sure how long it was from the time I dialed 911 and the police responded."

In fact, Officer Simpson arrived at the Bonds' residence at approximately 11:31 p.m. Upon arrival, Officer Simpson walked to the front of the house to investigate the incomplete call. Officer Simpson testified that he heard people "arguing" toward the back of the house. Officer Simpson then walked down the driveway toward the back of the house, where he later testified that he heard a female voice say "No, stop it, don't" and "Stop it, stop it, no." Ryan Thompson, the son of Bond's neighbor, told Officer Simpson that he also heard a female voice yelling.

Officer Simpson then looked in a side window that faced the driveway. This window is tinted and, according to the Bond's neighbor, Robert Thompson, is it not possible to see through the window. However, according to Officer Simpson, because it was dark outside and there was a light on inside the house, he could see through the window and into the bathroom of the residence. While there were wood blinds that could have obstructed Simpson's view, the blinds were tilted at an angle so that Officer Simpson could see down toward the floor of the interior. There he saw the unhinged bathroom door leaning against a wall and a shower curtain and broken curtain rod on the floor. Because of what he witnessed, Officer Simpson began knocking loudly on the door closest to the source of the voices he heard—the back door of the house. No one answered the door.

As he continued to knock on the back door, Officer Simpson heard yelling, and also heard "some shuffling noises and some thuds, which [he] believed to be somebody…being physically assaulted or wrestling inside the house." Officer Simpson described the noises further: "somebody getting thrown into a wall or it could have been moving furniture."

4

However, "based on the time of night, an incomplete [911] phone call and what was being said," he believed that someone could have been "physically assaulted and not able to yell for help."

Officer Simpson continued knocking loudly on the back door for a minute to a minute and a half, but no one answered the back door. Officer Simpson then radioed for additional officers to back him up. Officer Simpson also radioed the dispatcher and indicated that he heard arguing but that no one was answering the door. The dispatcher included this radio communication in the incident history detail or "CAD report" for the run at 11:34:55 p.m., noting "SUBJ NOT ANSWERING THE DOOR, WHEN OFFICERS ARRIVED THEY WERE FIGHTING."

Shortly after Officer Simpson radioed for additional help, Officers Patrick Bragg and Nikolas Layton arrived on scene. Officer Bragg arrived at 11:34 p.m., and Officer Layton arrived about a minute later. They walked to the front door of the residence and began knocking on the front door, while Officer Simpson continued knocking on the back door. Eventually, Bond made his way to the front door, and Officers Bragg and Layton told Bond to "open up" more than once and identified themselves as police. The second and third times they asked him to open the door, Leslie refused, saying "I ain't opening shit." Because Officers Bragg and Layton had made contact with Bond, Officer Simpson made his way to the front door. Based on what he had heard and seen, Officer Simpson then decided that he had enough information to "justify forcing entry." He did so by kicking at the door, forcing it open.

Once he forced entry to the residence through the front door, Officer Simpson, Officer Bragg, and Officer Layton entered a dark living room. Officer Simpson saw Bond near the living

5

room couch, although Bond and Officer Simpson dispute what exactly Bond was doing. Officer Simpson testified that Bond was in a dark room, standing "like he is going to physically fight us." Officer Simpson testified Bond's body was "bladed" "like a boxer" and that his fists were clenched. He also ordered Bond to put his hands up by saying "Show me your hands" or "Put your hands up," but Bond refused. Officer Simpson then discharged his taser. The prongs fired from the taser, hit Bond, and discharged for one five-second cycle. Officer Simpson did not use his taser again.

In contrast, Bond testified that the force of the kicking on the door sent Bond, who had been standing on the other side of it, backward and he landed on his living room couch in a near-prone position. Officer Simpson then discharged his taser.

Officer Bragg then attempted to place Bond into handcuffs. Bond refused to comply with the officers' commands to put his hands behind his back and the officers forcibly had to pull his hands back.

Around this time, Deana, who was not wearing any clothing, came into the living room from the bathroom. She saw her husband on the floor with "a couple cops" and her daughter sitting in a living room chair. As soon as she saw this, Deana realized that she was naked. Officer Layton took her and her daughter to the kitchen. Officer Layton "asked [Deana] if [she] was okay" and then escorted Deana to her room so that she could put on some clothes.

After Bond was placed in handcuffs, Officer Bragg escorted him outside. At this point, while Bond was being taken outside with his hands handcuffed behind his back, he fell, striking the ground with his face and breaking his jaw. The parties dispute how this occurred, but the officers maintain that Bond physically pulled away from Officer Bragg, dragging him out the

6

front door and toward the driveway while Officer Bragg held on to Bond by the handcuffs. Officer Bragg told Bond to sit down multiple times, but Bond continued to pull away from him. Officer Simpson testified that he then saw Officer Bragg "attempt to move [Bond's] foot in order to adjust his balance so he could help him sit down on the porch," a move that Officer Bragg described to Officer Simpson as a "foot sweep." Officer Simpson did not see what happened next.

In contrast, Bond maintains that he fell when Officer Bragg kicked him in the mid-back area. Bond speculates this happened because he believes Officer Bragg observed what "he thought was running" when Bond "stumbled" and "tripped over [a] step and landed in his driveway." Bond alleges he "stumbled" because Officer Bragg "jerked" and "spun him." Bond then alleges that once he landed on his face, Officer Bragg "kneed" him, placing one knee in his left leg and one knee in his back to restrain Bond from getting up. He was not struck again by any officer.

As Bond lay injured in the driveway, Officer Simpson came out and sat Bond down on the porch. Later Officer Layton came out of the house, fixed Bond's glasses, and "tried to get [the front] door frame squared away so it was lockable."

Bond was arrested for resisting law enforcement for pulling away from Officer Bragg. His case was tried before a jury in Marion Superior Court and he was found not guilty of the charges.

Bond now brings this action against the officers under § 1983.[2] Bond alleges that Officer

---

[2] Insofar as Bond asserted claims against the officers in their official capacities, the Court granted the Defendants' motion for judgment on the pleadings as to these claims. (dkt. no. 18)

Simpson's conduct (1) deprived him of his right to be secure from unreasonable searches and seizures under the Fourth Amendment; (2) violated his due process and equal protection rights by using excessive force when Officer Simpson deployed his taser; (3) deprived Bond of his due process rights when he deployed his taser because he placed Bond in a position of danger that Bond would not have otherwise faced; (4) violated his due process rights by falsely arresting Bond, and (5) constituted a failure to intervene when he did not intervene in Officer Bragg's use of the foot sweep maneuver.

Bond alleges that Officer Bragg's conduct (1) deprived him of his right to be secure from unreasonable searches and seizures under the Fourth Amendment; (2) violated his due process and equal protection rights by using excessive force in the form of a foot sweep; (3) deprived Bond of his due process rights when he executed the foot sweep because he placed Bond in a position of danger that Bond would not have otherwise faced; (4) violated his due process rights by falsely arresting Bond, and (5) constituted a failure to intervene when he did not intervene in Officer Simpson's use of his taser.

Bond alleges that Officer Layton's conduct (1) deprived him of his right to be secure from unreasonable searches and seizures under the Fourth Amendment; and (2) constituted a failure to intervene when he did not intervene in Officer Simpson's use of his taser and Officer Bragg's use of the foot sweep maneuver

### III. DISCUSSION

The Defendants have moved for partial summary judgment as to Bonds' claims against all the officers for (1) warrantless entry into Bond's home; and (2) failure to intervene. The Defendants have also moved for summary judgment as to all claims against Officer Layton on

8

the ground that there is no evidence of personal involvement in any purported claim. Finally, the Defendants argue that there is no evidence to support Bond's due process or equal protection claims.[3]

The Defendants also assert that they are entitled to qualified immunity on the above claims because they did not violate a clearly established right. The Court addresses each of these claims in turn.

### A. Unlawful Entry

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "The physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, and accordingly, warrantless entries are considered presumptively unreasonable." *United States v. Ellis*, 499 F.3d 686, 689 (7th Cir. 2007) (citations omitted). However, "the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Mincey v. Alabama*, 437 U.S. 385, 392 (1978). "This so-called 'emergency doctrine' is an exception to the ordinary requirement of a warrant for entry into a home." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1244 (7th Cir. 1994). "Thus, the burden falls upon the officer to show the existence of an objectively reasonable belief that this intrusion was made to 'render assistance or prevent harm to persons or property within.'" *Id.* "[A]s is normally the case for Fourth Amendment inquiries, the test is objective: 'the government must establish that the

---

[3] The Defendants do not move for summary judgment as to Bond's claims for excessive force and false arrest.

circumstances as they appeared at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house, apartment, or hotel room required immediate assistance.'" *United States v. Richardson*, 208 F.3d 626, 629 (7th Cir. 2000)(quoting *United States v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993)). The existence of exigent circumstances is a mixed question of law and fact. *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005).

In this case, the circumstances as they appeared at the moment Officer Simpson kicked down the door and entered the Bonds' home with Officers Bragg and Layton are disputed in the generic sense – Bond asserts that it was "impossible" for Office Simpson to have seen what he claims he had seen before he decided to kick down the Bonds' door.[4] More specifically, however, Bond's arguments boils down to an allegation that Officer Simpson is lying. "However, when challenges to a witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts–no proof–to support his claims, summary judgment in favor of the defendant is proper." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). Insofar as Bond

---

[4] Bond argues in his affidavit that it is "impossible" to see through the window because it is tinted, dressed with wooden blinds, and those blinds were closed. Furthermore, in his "Statement of Material Facts in Dispute," Bond argues that it was impossible for Officer Simpson to have seen through the window and that Officer Simpson could not have heard arguing coming from inside the house because Bond had stopped arguing with Deana immediately after the incomplete 911 call and the officers did not arrive until approximately ten to twenty minutes after the phone call had been placed. In response, the Defendants argue that Bond's affidavit and Statement include arguments, not facts, because Bond addresses matters about which he has no personal knowledge. To the extent that Bond does argue about matters not within his personal knowledge (i.e., what Officer Simpson saw and when Officer Simpson arrived), the Defendants' argument is well taken and these statements do not constitute evidence.

presents no evidence contradicting Simpson's assertions,[5] the Court considers Simpson's testimony as to what he had seen before he kicked in the Bonds' front door as the established circumstances surrounding the event.

The question thus becomes whether the circumstances as they appeared to Simpson at the moment of entry would lead a reasonable, experienced law enforcement officer to believe that someone inside the house required immediate assistance. Certain "911 calls reporting an emergency can be enough to support warrantless searches under the exigent circumstances exception, particularly where . . . the caller identifie[s] himself." *Richardson*, 208 F.3d at 630. While the caller in this case did not identify himself, the 911 call is not the only evidence upon which Simpson relied when he decided to enter the home. The undisputed evidence establishes that Simpson: (1) had been dispatched to a residence registered to a female following a disconnected 911 call; (2) had seen through a window an unhinged bathroom door leaning against a wall and shower curtain and broken curtain rod on a bathroom floor; (3) had been knocking on the back door but had received no answer; (4) had heard shuffling noises and thuds; and (5) had encountered a male subject who refused to open the door. The incomplete 911 call, combined with the damage in the bathroom, the failure to answer the door, the shuffling noises and thuds, and Bond's refusal to open the door, supports a reasonable belief that someone inside the house required immediate assistance. The officers' entry thus falls within the immediate aid

---

[5] There is a genuine dispute as to whether there was any yelling to be heard after the 911 phone call; Bond claims that he and Deana stopped arguing after she threw the phone in the sink, but Officer Simpson claims that he heard yelling when he arrived at the house. Accordingly, the Court has not considered this evidence in making its determination.

exception and does not run afoul of the Fourth Amendment.[6] For this reason, the Defendants' motion for summary judgment as to Bond's claim for warrantless entry is **GRANTED**.

### B. Failure to Intervene

Bond specifically explains that he makes no response to the Defendants' motion for partial summary judgment as to his claims for failure to intervene. However, this does not automatically entitle the Defendants to summary judgment. Rather, "[e]ven if the opposing party completely fails to respond to a summary judgment motion, Rule 56(e) permits judgment for the moving party only '*if appropriate*-that is, if the motion demonstrates that there is no genuine issue of material fact *and* that the movant is entitled to judgment as a matter of law.'" *Johnson v. Gudmundsson*, 35 F.3d 1104, 1112 (7th Cir. 1994) (citing *Tobey v. Extel/JWP, Inc.*, 985 F.2d 330, 332 (7th Cir. 1993) (emphasis supplied by Court in *Johnson*).

Under certain circumstances, a police officer may be liable for failing to stop other officers who perpetrate constitutional violations against a third person in his presence or within his knowledge. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Specifically

> [a]n officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Id.* (emphasis in original).

*1. Failure to Intervene in Officer Simpson's Conduct*

---

[6] Bond focuses on what Officer Simpson knew and then lumps analysis of the entry by Officers Bragg and Layton with Simpson's entry. The Court will do so as well.

Bond asserts a claim for failure to intervene against Officers Bragg and Layton with respect to Officer Simpson's deployment of his taser against Bond. The undisputed evidence establishes that Officers Bragg and Layton were present when Officer Simpson deployed his taser. However, assuming that Officer Simpson's use of the taser constitutes excessive force, Bond must still show that Officers Bragg and Layton *had reason to know* that Officer Simpson was using excessive force, and that the officers had a realistic opportunity to intervene. In choosing not to respond to the Defendants' motion for summary judgment as to this claim, Bond puts forth no evidence establishing either these elements or a genuine issue of material fact as to these elements. For this reason, the Defendants' motion to summary judgment as to Bond's claims for failure to intervene against Officer Simpson is **GRANTED**.

*2. Failure to Intervene in Officer Bragg's Conduct*

Bond alleges that Officers Simpson and Layton are liable for failing to intervene in Officer Bragg's use of the foot sweep. Assuming for the purposes of this argument that Officer Bragg's use of the foot sweep constitutes excessive force, Bond's claim for failure to intervene in this conduct fails as to Officer Layton because Officer Layton was not present. The undisputed evidence establishes that Officer Layton was inside the home, talking with Deana and the Bonds' daughter and helping Deana find some clothing.

Officer Simpson, on the other hand, saw Officer Bragg perform the foot sweep, but did not see what happened thereafter. Assuming again for the purposes of this inquiry that the foot sweep constitutes excessive force, Bond must put forth evidence establishing that Officer Simpson had reason to know that Officer Bragg's use of the foot sweep was excessive force, and that Officer Simpson had a realistic opportunity to intervene in Officer Bragg's conduct, or Bond

13

must demonstrate a genuine issue of material fact as to these elements. Bond has done neither.

For these reasons, the Defendants' motion for summary judgment as to Bond's claims for failure to intervene in Officer Bragg's activities is **GRANTED**.

### C. Equal Protection and Due Process

While Bond broadly alleges violations of the Equal Protection Clause and the Due Process Clause in his Complaint, he makes no response to the Defendants' motion for summary judgment on these claims. In doing so, Bond does not articulate his theory supporting these claims, much less carry his burden to assert prima facie cases. *See Zerante*, 555 F.3d at 584 ("[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial"). Summary judgment as to Bond's claims for equal protection and due process is accordingly **GRANTED**.

### E. Remaining Claims Against Officer Layton

To the extent that any claims remain against Officer Layton, Bond has not put forth the theory of his case nor asserted any evidence in support of his remaining claims. Summary judgment as to any remaining claims against Officer Layton is **GRANTED**.

### IV. CONCLUSION

The Defendants' motion for partial summary judgment as to Bond's claims for warrantless entry, failure to intervene, equal protection and due process, and any remaining claims against Officer Layton is **GRANTED**.[7]

---

[7] Because the Court grants summary judgment as to these claims on the bases articulated above, the Court need not address the Defendants' alternative qualified immunity argument.

SO ORDERED: 01/30/2012

_William T Lawrence_
Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication